UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
CARLENE M. QUAGLIA,                 )
          Plaintiff,                )
                                    )
          v.                        )    CIVIL ACTION
                                    )    NO. 1:09-10417-WGY
CAROLYN W. COLVIN,                  )
Commissioner, Social Security       )
Administration,                     )
                                    )
          Defendant.                )
_____)

MEMORANDUM OF DECISION

YOUNG, D.J.                                    October 8, 2014

I.    **INTRODUCTION**

     Carlene M. Quaglia ("Quaglia") brings this action against

Carolyn W. Colvin,[1] Acting Commissioner of the Social Security

Administration (the "Commissioner").  Quaglia asks this Court to

reverse and remand the Commissioner's decision denying Quaglia's

application for Social Security Disability Insurance Benefits

and Supplemental Security Income.  Pl.'s Mot. Reverse Decision

Comm'r ("Quaglia's Mot."), ECF No. 18.  The Commissioner

requests an order affirming the decision.  Mot. Order Affirming

Decision Comm'r ("Def.'s Mot."), ECF No. 22.

_____

     [1] The named defendant in this suit was originally Michael J.
Astrue, who was the Commissioner of Social Security at the time
the suit was filed.  On February 14, 2013, Carolyn W. Colvin was
named Acting Social Security Commissioner and has therefore been
substituted as the named defendant in this suit pursuant to
Federal Rule of Civil Procedure 25(d).

**A.    Procedural Posture**[2]

Quaglia filed for Social Security Disability Insurance
benefits and Supplemental Security Income on June 24, 2004,
asserting disability beginning September 1, 2003.  Pl.'s Mem.
Supp. Mot. Reverse Decision Comm'r ("Quaglia's Mem.") 1, ECF No.
19.  After an initial denial of benefits, Quaglia requested a
hearing on May 12, 2005.  Administrative Record ("Admin. R.")
79.[3]  She appeared and testified at a hearing before
Administrative Law Judge Barry H. Best (the "first hearing
officer") on August 17, 2006.  Id. at 79, 88.  Quaglia, her
attorney, a medical expert, and a vocational expert appeared at
a supplemental hearing held November 21, 2006.  Quaglia's Mem.
2.  In an opinion dated January 26, 2007, the first hearing
officer determined Quaglia was entitled to neither disability
insurance benefits nor supplemental security income.  Admin. R.
88.  The Appeals Council denied Quaglia's request for review,
prompting her to appeal to this Court for relief.  Quaglia's
Mem. 2.

Quaglia filed the complaint in this action on March 18,

---

[2] The Commissioner concurred with Quaglia's statement of the
procedural history, Mem. Supp. Comm'r's Mot. 1, ECF No. 23, thus
this Court relies upon Quaglia's summary of proceedings leading
to the present action, Pl.'s Mem. Supp. Mot. Reverse Decision
Comm'r 1-2, ECF No. 19, as well as the administrative record.

[3] The Commissioner provided a complete hard copy of the
record to this Court under seal.  The record has not been
docketed electronically.

2009, requesting this court reverse the first hearing officer's decision denying benefits. Compl. 1, ECF No. 1. For reasons not clear from the record or the parties' filings, the transcript from the November 21, 2006 hearing could not be located, prompting the Commissioner to request voluntary remand to the agency to carry out further proceedings and to reconstruct the administrative record. Def.'s Assented Mot. Remand Case Further Admin. Action Pursuant Sentence 6 42 U.S.C. § 405(g), ECF No. 9. This Court granted that motion in January 2010. Order Remand, Jan. 7, 2010, ECF No. 10.

On September 27, 2010, a new hearing occurred at the Social Security Administration before Administrative Law Judge Joel F. Gardiner (the "hearing officer"). Quaglia's Mem. 2. Quaglia, her attorney, and a vocational expert appeared. Id. The hearing officer rendered unfavorable decisions in a recommended decision dated October 15, 2010, and a final decision dated January 19, 2011, which both concluded Quaglia was not disabled and denied benefits. See Admin. R. 16-39. On April 3, 2012, the Appeals Council declined to exercise jurisdiction, id. at 7, finalizing the hearing officer's decision and leading to the reinstatement of the case before this Court on May 21, 2012. Assented Mot. Vacate Order Remand & Reinstate Case & Request Leave File Answer 1, ECF No. 13; Electronic Order, May 21, 2012.

The Commissioner answered Quaglia's original complaint on

September 5, 2012.  Answer, ECF No. 14.  On November 12, 2012,
Quaglia filed a motion to reverse the Commissioner's decision,
together with a memorandum in support.  Quaglia's Mot; Quaglia's
Mem.  The Commissioner in turn filed a motion to affirm the
decision with a memorandum in support on January 23, 2013.
Def.'s Mot.; Mem. Supp. Comm'r's Mot. ("Def.'s Mem."), ECF No.
23.

**B.  Facts**

Quaglia was a thirty-five year old woman with a college
education when the purported disability started; on the date of
the Commissioner's decision, Quaglia was forty-two years old.
Quaglia's Mem. 2.  Quaglia contends that her various physical
and psychological ailments -- including peripheral neuropathy
and neuropathic pain, pancreatitis, and depression -- constitute
a disability that rendered her unable to work during the
relevant period.  Id. at 2-3; Admin. R. 700.  She was insured
for disability through September 30, 2007.  Quaglia's Mem. 2.
Quaglia alleges a period of disability of roughly six and a half
years, running from September 2003 to March 2010.  Def.'s Mem.
2.

**1.  Relevant Work and Medical History**

Quaglia has held a variety of occupations, including jobs
as a personal care assistant, deli clerk, after school
instructor, and waitress.  Admin. R. 698.  She apparently

struggled to hold on to these positions due to failure to show, lateness, and making excuses to switch her schedule around.  Id. at 696, 698.

Quaglia has a history of depression and alcohol abuse.  Id. at 705, 708.  She was admitted to a treatment center from March to April 2004 for psychiatric and substance abuse reasons.  Id. at 241.  After the treatment stint, she quit drinking alcohol entirely and maintained her sobriety.  Id. at 709.  Sometime in or around 2008, Quaglia's mother and aunt committed her for psychiatric treatment for belligerence and depression.  See id. at 707.

Quaglia's disability claim stems from physical and psychological conditions that she alleges prevented her from engaging in gainful employment.  Id. at 699-700.

### a.  Physical Disability

Physically, Quaglia has peripheral neuropathy in her hands and feet.  Id. at 700.  The condition limits her ability to walk, and her feet hurt constantly.  Id. at 155.  At the hearing, she testified that she can stand for "maybe an hour if [she] ha[s] to, but [she] feel[s] pain all the time."  Id. at 719.  She described her pain as 10 out of 10, lessening to 8 out of 10 with medication that she takes three times each day.  Id. at 719-21.

Throughout the period of alleged disability, a number of

doctors attended to Quaglia. In July 2004, Dr. Ranbir Dhillon diagnosed her with neuropathy related to alcohol abuse "with predominantly sensory symptoms." Id. at 243. Dr. Edgar Ross ("Dr. Ross") confirmed this diagnosis in January 2005, noting alcohol and peripheral neuropathy with "decreased pinprick sensation in the lower extremities." Id. at 305. By December 2005, Dr. Ross observed that it was "difficult to understand how [the loss of sensation] could be related to alcohol, when [Quaglia] reports that she has not had a drink in 20 months." Id. at 352. That same month, Dr. Fereshteh Soumekh also diagnosed peripheral neuropathy. Id. at 353-54.

In February 2005, Dr. Jean Siddall-Bensson ("Dr. Siddall-Bensson"), Quaglia's primary care physician, reported that she suffered from distal neuropathy and irritable bowel syndrome, limiting her ability to walk distances greater than one block and to stand for longer than twenty to thirty minutes. Id. at 294-95. Dr. Siddall-Bensson opined that Quaglia was "unable to work." Id. at 297. Dr. Siddall-Bensson again concluded in October 2005 that Quaglia was limited in her ability to walk, stand, or lift things, and experienced pain in her lower extremities. Id. at 334. In May 2006, Dr. Ross opined that Quaglia was unable to sit, stand, or walk for more than two hours during an eight-hour workday, and that she suffered from severe pain. Id. at 336-37. He concluded this pain would

preclude Quaglia from sustaining the necessary concentration to hold full-time employment.  Id. at 337.

Dr. Ross treated Quaglia through 2010, observing that she continued to suffer from peripheral neuropathy and neuropathic pain.  Id. at 637-38, 644, 650-51, 658, 664.  Dr. Siddall-Bensson also saw Quaglia throughout the entire period for which she seeks disability benefits.  Quaglia's Mem. 5.

Several state agency doctors rendered opinions about Quaglia's functional capacity to work.  In September 2004, a state physician found Quaglia could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for at least two hours in an eight-hour day, and sit for about six hours (both with breaks).  Admin. R. 245, 251.  The state physician stated that, as compared to the opinions of the treating physicians, he drew no significantly different conclusions about Quaglia's limitations and restrictions.  Id. at 250.  A second examination by a state physician in May 2005 found Quaglia could stand and/or walk (with normal breaks) for two to three hours in an eight-hour workday.  Id. at 309, 315.  The physician observed sensory neuropathy and noted "sharp, constant, burning, aching pain in the bottom of her feet."  Id. at 309.

### b.   Psychiatric/Psychological Disability

Quaglia's alleged psychological disability is major depressive disorder, which doctors have treated with Zoloft and

Cymbalta.  Id. at 700, 704.

The state agency requested that Dr. Irwin Bennett examine Quaglia in October 2004.  Id. at 252, 254.  He diagnosed her with Bipolar I disorder and depression, with a Global Assessment of Functioning ("GAF") of 55.[4]  Id. at 254.  The following month, another state physician concluded Quaglia's moderate limitations in concentration, following instructions, and ability to respond to changes would allow her to work for two to eight hours in an unpressured setting, handling routine work tasks with some infrequent accommodations.  Id. at 255-57.  A follow-up state psychiatric evaluation in February 2005 found Quaglia had some moderate limitations maintaining concentration and performing consistently, but concluded she retained functional capacity to remember, adapt to, and carry out most work tasks and relate to others.  Id. at 274-76.

In January 2005, Dr. Robert Newlin Jamison ("Dr. Jamison") diagnosed Quaglia with depression.  Id. at 302-03.  In June 2005, Dr. Judy Froehlich ("Dr. Froehlich") recorded Quaglia's GAF as 50.  Id. at 365.  In October 2005, however, Dr. Siddall-Bensson noted that "[Quaglia's] depressive symptoms have been

_____

[4] A GAF is a tool to measure psychiatric functioning ranging from mild issues to serious issues that would impair social, occupational, or educational presence.  See Quaglia's Mem. 6 n.2.  A score of 61-70 indicates mild social and mood difficulties.  Id.  A score of 51-60 indicates moderate symptoms.  Id.  A score of 41-50 indicates serious symptoms. Id.

controlled and she is in therapy for this and has been compliant
with the therapy." Id. at 334.  Dr. Froehlich thereafter
recorded a GAF of 70 in November 2005.  Id. at 386.  While
visiting Dr. Siddall-Bensson in December 2005, Quaglia denied
depression and anxiety.  Id. at 485-86.  Furthermore, in May
2006, Dr. Jamison recorded a GAF of 67 to 70, despite noting
symptoms of depression and anxiety.  Id. at 356.

In July 2006, however, Dr. Emily Deans ("Dr. Deans")
assessed Quaglia's GAF as 45 and noted major depressive
disorder.  Id. at 453-54.  Dr. Deans concluded that due to her
limitations, Quaglia had a "substantial loss of ability to
respond appropriately to supervision, co-workers and usual work
situations" as well as to "changes in a routine work setting."
Id. at 448.  Also in July 2006, psychotherapist Lauretta
Valenti, MA ("Valenti") found Quaglia experienced a moderately
severe impairment in relating to other people, responding to
customary work pressures, and performing complex tasks.  Id. at
446-47.  The record lacks psychological treatment notes from
late 2006 until mid-2009.  Def.'s Mem. 3.

During the fall of 2009, Valenti recorded GAFs between 40
and 60 related to Quaglia's moderate major depressive disorder.
Admin. R. 564-71.  In September 2010, Valenti continued to
diagnose moderate major depressive disorder and noted neuropathy
interfering with Quaglia's ability to work, and concluded

Quaglia could not sustain competitive full-time work on an ongoing basis. See id. at 625-26.

As of her hearing in September 2010, Quaglia was not seeing a psychiatrist. Id. at 701. She stopped seeing her previous psychologist, Dr. Joshua Golden ("Dr. Golden"), because he made her "feel worse," made her cry, and told her there was nothing wrong with her. Id. at 701-02. Dr. Golden took Quaglia off medications for narcolepsy and bipolar disorder. Id. at 704. Prior to Dr. Golden, Quaglia saw Dr. Deans, who ended their doctor-patient relationship when Quaglia was unable to keep appointments. Id. at 702-03.

**2.    Hearing before the Social Security Administration**

At the hearing, Quaglia testified that she lived with her aunt and uncle. Id. at 689. She had returned to work in March 2010 as a personal care assistant, and was working between eighteen and forty-five hours a week, typically twenty-five hours. Id. at 691-93. When the hearing officer asked Quaglia why she returned to work, she stated she was "being tossed out of the house." Id. at 695. She agreed that "financial necessity" was the primary motivation, and there was no change in her condition that led her to return to work. Id. at 696-97. When asked why she did not return to work two or three years earlier when she was able to do so now despite there being no change in her condition, Quaglia replied that she "had no

vehicle" and "no money." Id. at 699. She added that lying, procrastination, and general unreliability have hampered her ability to return to work and hold a steady job. See id. Quaglia expressed concern that due to "bad days" when her depression makes it difficult to get out of bed, she is "going down the same road" by "doing exactly what made [her] lose jobs before." Id. at 716-17.

### C. Federal Jurisdiction

This Court has jurisdiction over this action pursuant to 42 United State Code section 405(g), granting judicial review of final orders and decisions by the Commissioner of Social Security. 42 U.S.C. § 405(g).

## II. LEGAL STANDARD

### A. Standard of Review

In reviewing the Commissioner's decision, this Court considers the entire administrative record along with the pleadings and retains the power to affirm, modify, or reverse. Id. Review is limited to determining whether the hearing officer employed the correct legal standards; findings of fact are conclusive, provided they are supported by substantial evidence. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)).

Substantial evidence is the touchstone of reviewing an

administrative agency's findings of fact; those findings will stand where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation mark omitted).  It is the role of the hearing officer, not a reviewing court, to make credibility determinations and to draw inferences from the record.  Rodriguez, 647 F.2d at 222.  This Court must affirm a decision supported by substantial evidence "even if the record arguably could justify a different conclusion." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

The hearing officer may not, however, ignore evidence and "must take into account whatever in the record fairly detracts from its weight." Diaz v. Sec'y of Health & Human Servs., 791 F. Supp. 905, 912 (D.P.R. 1992) (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 488 (1951)) (internal quotation marks omitted).  "The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham." Kent v. Schweiker, 710

F.2d 110, 114 (3d Cir. 1983).

**B.  Social Security Disability Standard**

To have a recognized disability within the meaning of the
Social Security Act, an individual must be unable "to engage in
any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months."  42
U.S.C. § 423(d)(1)(A).

Social Security Administration regulations require a
hearing officer to proceed through a five-step analysis to
determine whether a claimant is disabled.  See 20 C.F.R.
§ 404.1520(a)(4).  The hearing officer must determine: (1)
whether the claimant is engaged in substantial gainful activity;
(2) whether the claimant has a sufficiently severe impairment;
(3) whether the impairment meets or equals a listed impairment;
(4) whether the claimant has the residual functional capacity to
perform his past relevant work; and (5) whether the impairment
prevents the claimant from doing any other work considering the
claimant's age, education, and work experience.  Id.

The claimant bears the burden in the first four steps to
prove disability within the meaning of the Act.  Goodermote v.
Sec'y of Health & Human Servs., 690 F.2d 5, 7 (1st Cir. 1982)
(citing Sherwin v. Sec'y of Health & Human Servs., 685 F.2d 1, 2

13

(1st Cir. 1982)).  Once the claimant has established the fourth
step -- that she is unable to return to her former employment --
the burden shifts to the Commissioner to prove the final step:
that the claimant is able to engage in some other substantial
gainful activity that exists in significant numbers in the
national economy.  Put differently, the Commissioner must show
that, despite her inability to return to past job, the claimant
has the ability to pursue another less physically or
psychologically demanding career.  Id.  The Social Security
Administration has promulgated medical-vocational guidelines to
aid this inquiry.  Id. (citing 20 C.F.R. § 404, Subpart P, app.
2).

### C.    The Hearing Officer's Decision

The hearing officer first found that Quaglia had started
working in March 2010, with that work rising to the level of
substantial gainful activity from April 2010 onward.  Admin. R.
18.[5]  The hearing officer next determined Quaglia had a number of
severe impairments during the relevant time period, including
distal peripheral alcoholic neuropathy, syncope, depression,
bipolar disorder, and alcohol abuse disorder in remission.  Id.
Moving on to step three, the hearing officer concluded that none
of Quaglia's impairments, nor the combined effect of her

---

[5] This substantially gainful activity marked the end of the
closed period for which Quaglia seeks benefits -- from September
1, 2003, through March 2010.  Admin. R. 16.

14

impairments, constituted a listed impairment under the
applicable regulations.  Id. at 19.  At the fourth step, the
hearing officer concluded that Quaglia retained the residual
functioning capacity to engage in sedentary to light work.  Id.
at 21.  While noting that Quaglia's mental impairments may
interfere with her ability to concentrate, the hearing officer
concluded that she nonetheless had the capacity to perform
repetitive, routine work on a regular basis, including her past
jobs as a personal care attendant, waitress, and deli clerk.
Id. at 21, 24.  Although the hearing officer found that Quaglia
could perform past relevant work -- a finding sufficient to
preclude a conclusion of disability and to deny benefits -- he
nonetheless offered alternative findings under step five.  Id.
at 24.  Relying on the vocational expert's testimony, the
hearing officer determined that Quaglia had the functional
capacity to work other jobs in the national and Massachusetts
economy, including as a motel clerk, dispatcher, telephone
operator, or telemarketer.  Id. at 25.

The hearing officer ultimately concluded that Quaglia was
not disabled as defined in sections 216(i), 223(d), and
1614(a)(3)(A) of the Social Security Act and therefore denied
benefits and supplemental security income.  Id. at 26.

**III. ANALYSIS**

Quaglia challenges the hearing officer's decision on two

grounds.  Quaglia first asserts the hearing officer's findings

are not supported by substantial evidence owing to the relative

weight assigned to treating and non-examining medical opinions.

Quaglia's Mem. 9.  Additionally, Quaglia argues the hearing

officer failed properly to apply the standard for pain

evaluation and credibility as set out in <u>Avery</u> v. <u>Sec'y of</u>

<u>Health & Human Servs.</u>, 797 F.2d 19 (1st Cir. 1986), and Social

Security Ruling 96-7p.  Quaglia's Mem. 11.

### A.    Weight Given to Treating and Non-Examining Medical Sources in Determining Residual Functioning Capacity

Quaglia argues that the hearing officer erred in his

residual functioning capacity determination by giving

insufficient weight to the opinions of her primary care

physician, pain management specialist, psychiatrist, and

therapists.  <u>Id.</u> at 9.  Quaglia further notes that the state

agency physicians' opinions were derived from assessments in

2004 and 2005 and failed to consider later evidence supporting

Quaglia's diagnosis of physical and psychiatric disability.  <u>Id.</u>

at 9-10.[6]

Hearing officers can neither ignore medical evidence nor

substitute their views for medical opinions that went

---

[6] None of the medical sources who rendered opinions
testified at the hearing at the Social Security Administration,
but their written evaluations were incorporated into the
administrative record, considered by the hearing officer, and
have been reviewed by this Court.

uncontroverted.  <u>Nguyen</u>, 172 F.3d at 35 (citing <u>Rose</u> v. <u>Shalala</u>, 34 F.3d 13, 18 (1st Cir. 1994)).  They must, however, weigh the evidence in the record and resolve conflicts.  So long as a hearing officer's conclusion is supported by substantial evidence, such determination will not be disturbed even if a reasonable mind could have reached a different result.  <u>See</u> <u>Rodriguez Pagan</u>, 819 F.2d at 3.

The relevant regulations define a "treating source" as a medical source who "has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.  The hearing officer ought give "more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)."  20 C.F.R. § 404.1527(c)(2).  But where treating sources' opinions are "'inconsistent with other substantial evidence' in the record, [a hearing officer] need not give the opinions controlling weight."  <u>Small</u> v. <u>Astrue</u>, 840 F. Supp. 2d 458, 465 (D. Mass. 2012) (quoting 20 C.F.R. § 404.1527(d)(2)).  Whatever weight the hearing officer ultimately assigns to a treating source's opinion, the hearing officer must give "good reasons" for the determination.  <u>Rosa</u> v. <u>Astrue</u>, 783 F. Supp. 2d 179, 186 (D. Mass. 2011) (Gertner, J.)

(quoting 20 C.F.R. § 404.1527(d)) (internal quotation marks omitted).

The hearing officer gave "significant weight to the state agency medical and psychological consultants' assessments" in considering Quaglia's physical and psychological condition. Admin. R. 24. Conversely, the hearing officer gave limited weight to the opinions of Drs. Siddall-Bensson, Deans, Jamison, and Ross and to that of Ms. Valenti. Id. There is no dispute that these were Quaglia's treating sources. Each provided her with medical treatment during the relevant period, and several continued that treating relationship through the hearing date.

In conferring minimal weight on Dr. Sidall-Bensson's and Dr. Ross's opinions finding disability, the hearing officer concluded they were both internally inconsistent and inconsistent with other medical opinions and with the record as a whole, including Quaglia's work activity during the alleged disability period. Id. Specifically, Dr. Sidall-Bensson opined in July 2004 and August 2006 that Quaglia's severe neuropathy in her feet limited her ability to stand for long periods of time and prevented her from working. Id. at 294-97, 455-57. In May 2006, Dr. Ross concluded Quaglia could sit, walk, or stand for no longer than two hours, and, like Dr. Sidall-Bensson, concluded her severe pain due to neuropathy prevented her from working full-time on an ongoing sustained basis. Id. at 336-37.

Turning to the non-examining sources, one state agency physician assessment in 2004 determined Quaglia could walk or stand for "at least" two hours in an eight-hour workday, lift twenty pounds occasionally, lift ten pounds frequently, and sit for about six hours in an eight-hour workday.  Id. at 245, 251. The physician checked "no" in response to a question as to whether any of these conclusions differed from those of treating physicians on file.  Id. at 250.  Another state agency physician came to similar conclusions about Quaglia's physical condition in 2005.  See id. at 309-10, 315.

The hearing officer specifically relied on the state agency opinions to conclude that Quaglia had the residual functional capacity to perform sedentary to light work, with some limitations on her ability to push and pull, and could stand for two to three hours during an eight-hour workday.  Id. at 23-24. The hearing officer focused on the fact Quaglia was physically active throughout the periods that she claimed to suffer from debilitating physical pain.  Id. at 22.  She worked (albeit sporadically) during the alleged disability period, cared for and walked her dogs regularly, and at the time of the hearing, had returned to work despite no apparent change in her medical condition.  Id. at 22-23.  The hearing officer further noted that Quaglia visited her pain management specialist, Dr. Ross, "only intermittently."  Id. at 22.

The ultimate disability conclusion aside, there is in reality little discernible conflict between the assessment of Quaglia's physical impairments by the state agency physicians and those by the treating physicians. Both found Quaglia suffered from pain related to her neuropathy, causing symptoms that affected her physical ability to stand and sit in a workplace setting. Compare id. at 336 (reflecting treating source's determination that Quaglia would be unable to sit, walk, or stand for more than two hours due to pain), with id. at 245, 250 (reflecting state physician's determination that Quaglia could stand or walk for at least two hours with breaks and noting that the treating source's findings were not "significantly different"). On the whole, the hearing officer noted these symptoms, but in light of Quaglia's testimony and conduct during the relevant period, concluded that the symptoms were not sufficient to support a finding of disability. Id. at 21-24. This determination was supported by substantial evidence.

The conflict was more marked among the psychological evaluations. Ms. Valenti concluded that Quaglia's moderate major depressive disorder would preclude full-time employment. Id. at 625. State assessments concluded, however, that despite Quaglia's moderate limitations, she could work two-to-eight-hour days in an unpressured setting. Id. at 256-57, 276.

Weighing the psychiatric evidence, the hearing officer described Quaglia's psychiatric treatment as "sporadic." Id. at 23. Specifically, he emphasized that Quaglia received no psychiatric treatment from 2007 until August 2009. Id. at 24. Moreover, although Quaglia's GAF scores fluctuated, she showed signs of improvement in treatment and worked during the relevant period. Id. at 23. State agency consultants evaluating Quaglia's mental state concluded that she was capable of concentrating sufficiently to carry on routine, repetitive tasks. Id. at 24.

Quaglia invites this Court independently to resolve the conflicts between medical source opinions and reweigh the evidence, yet this would exceed the Court's powers on judicial review. Resolving evidentiary conflicts in the record is strictly the domain of the hearing officer. Barrientos v. Sec'y of Health & Human Servs., 820 F.2d 1, 2 (1st Cir. 1987). The medical records, hearing testimony, and other materials of record "amounted to substantial evidence, i.e., 'such relevant evidence as a reasonable mind might accept to support a conclusion,' that [Quaglia] was not disabled." See Perez v. Sec'y of Health, Educ. & Welfare, 622 F.2d 1, 3 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). This Court cannot, on the basis that a different outcome was possible, say that the hearing officer erred. See Rodriguez

Pagan, 819 F.2d at 3.  This would amount to second-guessing the hearing officer, which this Court simply cannot do.  Id.  The above conflicts and inconsistencies in medical evidence and hearing testimony, a quantum of which supported the finding that Quaglia was not disabled, were thus adequate for the hearing officer to confer less weight on the treating sources.  See Small, 840 F. Supp. 2d at 465.

Turning from the question of whether the hearing officer was permitted to assign less weight to the opinion of treating sources and focusing instead on how that weighing affected the hearing officer's ultimate determination, this Court observes that there was evidence that Quaglia suffered from physical and psychiatric conditions that prevented her from working, or at least made work quite difficult.  All medical experts found that her physical ailments rendered her unable to work in jobs requiring physical activity or sitting for long periods of time. See, e.g., id. at 245, 336.  Mentally, Quaglia's condition was cyclical, worsening and then improving several times over the relevant period.  See id. at 302-03, 365, 386, 564-68, 577 (reporting GAF scores and mental health assessments that fluctuated significantly over time).  Thus, there was evidence in the record that could have supported a finding of disability. See id. at 297, 334, 337.  The hearing officer gave due consideration to this medical and testimonial evidence put forth

by Quaglia. See id. at 22 ("[T]he claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ."). Ultimately, however, viewing the entire evidentiary record, the hearing officer concluded "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functioning capacity assessment . . . ." Id.

The root of Quaglia's argument on this point is that, in making this overall determination, the hearing officer wrongly resolved inconsistencies between treating and non-treating sources in favor of the latter. See Quaglia's Mem. 9-11. An examination of the record and the decision below, however, suggests that these inconsistencies between medical sources actually mattered little to the outcome of Quaglia's case: rather, the hearing officer grounded his decision more strongly in inconsistencies between Quaglia's allegations of disability and her proferred non-medical evidence. He noted, for instance, that reports made by Quaglia's treating sources were "inconsistent with . . . claimant's reported work activity." Admin. R. 24. Additionally, the hearing officer focused on Quaglia's admission that her decision to return to work had nothing to do with any change in her medical condition, but rather was financially motivated. Id. at 23. The hearing

officer properly emphasized this fact -- if Quaglia's physical and psychological conditions had indeed rendered her unable to work during the period of alleged disability, a return to work without any physical or psychological improvement seriously undermines Quaglia's contention that she was disabled. Thus, at bottom, Quaglia's attack on the hearing officer's decision largely flows from his determination of her own credibility. For the reasons set forth below, that attack fails.

**B.   Pain Evaluation and Credibility Determination**

Quaglia contends that the hearing officer erred in finding that her testimony about pain was not credible, arguing that the hearing officer failed properly to apply the so-called _Avery_ factors. Quaglia's Mem. 13. _Avery_ sets out a multi-factor analysis for subjective complaints of pain by Social Security claimants. See 797 F.2d at 28-29. In assessing a claimant's credibility under _Avery_, a hearing officer must consider "(1) [t]he nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) [p]recipitating and aggravating factors, (e.g., movement, activity, environmental conditions); (3) [t]ype, dosage, effectiveness, and adverse side-effects of any pain medication; (4) [t]reatment, other than medication, for relief of pain; (5) [f]unctional restrictions; and (6) [t]he claimant's daily activities." 797 F.2d at 29.

"[The First Circuit] pay[s] 'particular attention' to [the hearing officer's] evaluation of complaints of pain in light of their 'subjective nature.'" Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 523 (1st Cir. 1989) (quoting Sherwin v. Sec'y of Health & Human Servs., 685 F.2d 1, 3 (1st Cir. 1982), cert. denied, Picard v. Sec'y of Health & Human Servs., 461 U.S. 958 (1983)). Testimony about pain does not require corroboration with objective evidence, but "must be consistent with medical findings." Bazile v. Apfel, 113 F. Supp. 2d 181, 185 (D. Mass. 2000) (quoting Dupuis v. Sec'y of Health & Human Servs., 869 F.2d 622, 623 (1st Cir. 1989)) (internal quotation marks omitted).

As noted above, it is the hearing officer's role to make credibility determinations. Irlanda Ortiz, 955 F.2d at 769. This determination is entitled to deference where supported by substantial evidence, for the hearing officer has the opportunity to observe the claimant, examine the claimant's demeanor, and consider how the testimony squares with other evidence in the record. Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). Where a claimant's testimony is discredited, the First Circuit requires the hearing officer to "make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]." Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st

Cir. 1986). This Court has held that not only are specific findings required, but the hearing officer must point to the precise testimony and evidence suggesting that the claimant's complaints of pain lack credibility. Bazile, 113 F. Supp. 2d at 187 (tracing the Ninth Circuit precedent and cases the First Circuit relied upon in Da Rosa to elucidate a stricter credibility standard).

The hearing officer began the credibility analysis by observing that Quaglia's impairments could cause the symptoms complained of, but ultimately concluded that Quaglia's statements about the frequency, intensity, and duration of the symptoms were not credible. Admin. R. 22. In support of his own credibility conclusion, the hearing officer cited the first hearing officer's credibility determination:

> In January 2007, [the first hearing officer] found the claimant's allegations as to severity of pain and symptoms to be exaggerated and not credible. [The first hearing officer] further found her capable of performing work at the light exertion level with moderate restriction in her ability to maintain attention and concentration. While I find she credibly testified regarding her present work activities, I also find that she is not credible regarding her limitations and pain level, as the objective medical evidence does not support these assertions.

Id. The hearing officer further noted that "[n]either the Federal District Court nor the Appeals Council found the findings of the prior [hearing officer] to be erroneous." Id.

Had the hearing officer reached his credibility
determination simply by relying upon that of the first hearing
officer, this would certainly be problematic.  Cf. Simmons v.
Barnhart, 148 F. App'x 134, 137 (3d Cir. 2005) (noting that
hearing officer's use of notes by previous hearing officer from
prior hearing where transcript was lost would deprive claimant
the chance to cross-examine witnesses and rebut evidence and
testimony).  The reason courts defer to a hearing officer's
credibility determination, at least in part, is the critical
evaluation process made possible in a live, first-person
testimonial setting.  See Frustaglia, 829 F.2d at 195.
Accordingly, a reviewing court ought pause before conferring
such deference when the hearing officer adopts credibility
determinations from a hearing over which he did not preside.

Upon this record, however, the hearing officer did not
simply adopt the first hearing officer's credibility findings.
Rather, the hearing officer concluded that Quaglia was not
credible after comparing Quaglia's medical records and testimony
against the residual functioning capacity determination.  Admin.
R. 22 ("[T]he claimant's statements concerning the intensity,
persistence, and limiting effects of these symptoms are not
credible to the extent they are inconsistent with the above
residual functional capacity assessment . . . ."); see also id.
at 24 ("[T]he above residual functional capacity assessment is

supported by the objective medical evidence, the opinions as discussed and the record as a whole, including hearing testimony.").

In other words, the hearing officer considered and discredited Quaglia's subjective complaints of pain based upon the entire record -- not just on the prior determination by the first hearing officer. He summarized Quaglia's testimony that "her neuropathy is beyond repair," that she needs medications such as Gabapentin and Neurotin to function (which "serve to take the 'edge' off"), and that she experiences pain and numbness in her feet that limits her ability to stand for more than one hour. Id. at 21-22. During the hearing, Quaglia rated her pain as 10 out of 10, lessening to 8 out of 10 only with medication. Id. at 719-20. In questioning Quaglia about her pain, the hearing officer told her that a pain level of 10 would be the "most excruciating pain imaginable," i.e., "an emergency room level of pain." Id. Quaglia maintained this was the level of pain she experienced "24/7." Id. The hearing officer then compared this testimony regarding pain with Quaglia's testimony that she considered treating the pain with alternative treatments like Botox, regularly walked her dogs each day, worked on the administrative side of a catering company in 2006, worked double shifts in January 2010 despite intense pain, had returned to work as of the hearing date due to financial

necessity rather than a change in condition, and saw Dr. Ross,
her pain management physician, infrequently from 2006 to 2010.
Id. at 22-23.  In making this comparison, the hearing officer
expressed skepticism that Quaglia would be able to carry on all
of these activities while suffering from "constant debilitating
pain."  Id. at 22.

By summarizing and weighing Quaglia's specific testimony
regarding her pain against activities she undertook, the hearing
officer correctly employed the level of specificity required
under Avery.  Cf. Bazile, 113 F. Supp. 2d at 187 ("[C]redibility
determinations must be backed by specific findings." (quoting Da
Rosa, 803 F.2d at 26) (internal quotation marks omitted)).
While the hearing officer's treatment of each factor can hardly
be described as thorough, there is no requirement that the
hearing officer discuss each and every Avery factor at length in
reaching a conclusion.  See Gordils v. Sec'y of Health & Human
Servs., 921 F.2d 327, 330 (1st Cir. 1990) (finding minimal
discussion of the claimant's daily activities and demeanor
sufficiently considered non-medical evidence as required under
Avery); see also Vega v. Astrue, No. 11-10406-WGY, 2012 WL
5989712 at *8 (D. Mass. Mar. 30, 2012) (interpreting Avery to
require inquiry and consideration of each factor, but not
"explicit written analysis" of each factor).  "We cannot doubt,
therefore, that the [hearing officer] gave due consideration to

non-medical evidence relating to claimant's pain." <u>Gordils</u>, 921 F.2d at 330.

Thus, there were clear inconsistencies between the complaints of pain and activity undertaken, creating conflict that the hearing officer resolved against Quaglia.  The hearing officer's resolution of the conflict and conclusion, supported by substantial evidence, may not be disturbed.  <u>See</u> <u>Barrientos</u>, 820 F.2d at 2.  Quaglia urges this Court to reverse the Commissioner on the grounds that the hearing officer failed to make adequate pain findings.  Quaglia's Mem. 11-13.  While the hearing officer could have made more express findings, a review of the entire record shows that substantial evidence supports the hearing officer's ultimate determination.  <u>See</u> <u>Frustaglia</u>, 829 F.2d at 195 (citing <u>Gray</u> v. <u>Heckler</u>, 760 F.2d 369 (1st Cir. 1985)).  This Court must therefore affirm the decision.

## IV.  CONCLUSION

For the reasons set forth above, this Court DENIES Quaglia's motion for an order reversing the decision of the Commissioner, ECF No. 18, and GRANTS the Commissioner's motion to affirm the Commissioner's decision, ECF No. 22.  Judgment shall enter for the Commissioner.

SO ORDERED.

_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE